UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TINA CAVENESS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:10-0650 |
| | ) Judge Sharp |
| VOGELY & TODD, INC. and | ) |
| DON DURHAM, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

Pending before the Court is the Motion for Partial Summary Judgment (Docket No. 20) filed by Plaintiff Tina Caveness. By way of that Motion, Plaintiff seeks summary judgment on Count I of her Amended Complaint in which she alleges Defendants Vogely & Todd, Inc. ("V&T") and Don Durham ("Durham") (collectively "Defendants") violated the Fair Labor Standards Act,("FLSA"), 29 U.S.C. § 201 *et seq*. Specifically, Plaintiff argues there are no genuine issues of material fact that she was a non-exempt employee under the FLSA, that Defendants failed to pay her for overtime work at one-and-a-half times her normal hourly rate as required by 29 U.S.C. § 207(a)(1), and that Defendants are jointly and severally liable to Plaintiff as a result of their willful failure to pay said overtime wages. Defendants have filed a response in opposition to the Motion (Docket No. 40), to which Plaintiff has filed a reply (Docket No. 41). Because factual disputes abound in this case and several of those disputes lie at the core of Plaintiff's FLSA claim, her Motion for Partial Summary Judgment will be denied.

## I. FACTUAL BACKGROUND

V&T is a body shop that repairs or restores damaged vehicles and provides mechanical

1

collision repair and restoration. In calendar year 2009, V&T's annual gross revenue exceeded $500,000.00. Durham is the owner and managing agent of V&T and has the primary responsibility for hiring, firing, and determining employee pay rates at V&T. Both Defendants are "employers" under 29 U.S.C. § 203(d).

On April 15, 2009, Durham hired Plaintiff on a probationary basis to work as an estimator at V&T at a rate of $750.00 per week. The qualifications for an estimator at V&T include prior experience, being able to input information into a computer and proficiency in the computer estimating system. There is no specific educational requirement to become an estimator at V&T.

Apart from agreeing that Plaintiff did not have the authority to hire or fire employees, did not interview, train or adjust technicians' rates of pay, did not establish budgets for V&T, and did not establish safety protocols or legal compliance measures at V&T, the parties hotly dispute what Plaintiff did do as an estimator at V&T. In fact, they do not even agree whether estimating is an essential part of the services provided to V&T's customers (as Plaintiff claims), or whether estimating is an essential part of V&T's general business operations (as Defendants claim).

Plaintiff asserts the job duties of an estimator included looking at, and documenting visible vehicle damage; inputting damage information into a computer program that calculates the parts needed and labor costs; informing the customer and insurance company of the status and cost of repairs; and making sure the work gets completed, and V&T gets paid for the work. Plaintiff also claims she did not manage other employees or tell them how to do their particular jobs; rather, after a repair job had been assigned by Durham or another manager to a particular technician, Plaintiff made sure the technician was aware of the job, had the appropriate paperwork, and the job was moving along for reporting purposes. In this regard, Plaintiff claims the technicians reported to, and were managed by, Durham, and the only thing technicians reported to her was the status of a particular job so she

could inform the customer.

Defendants describe Plaintiff's job duties much more broadly. In addition to those identified by Plaintiff, Defendants claim that, without direct supervision, Plaintiff decided whether to: repair or replace damaged parts and components; use new, used, or refurbished parts; use parts manufactured by the original manufacturer or a third-party; and override computer software estimates regarding labor hours. Defendants also claim Plaintiff decided what tasks to assign to which technician, how to scheduled and prioritize their work, and when to release a vehicle to the customer. Defendants further assert Plaintiff negotiated agreements with insurance companies and private-pay customers concerning the scope of work and the price to be paid, investigated and advised insurance companies concerning coverage issues such as pre-existing damage, and whether the damage to the vehicle appeared to be as a result of the cause claimed by the owner. Defendants also claim that Plaintiff acted as the face of V&T with respect to negotiating agreements, answering questions about estimates, scheduling repairs, collecting payments, negotiating with customers concerning potential additional repairs or other additional work required by damage discovered in the course of repair, and providing quality assurance on completed repairs.

The parties also disagree on whether Plaintiff worked more than forty hours on any given week, and whether it was even contemplated that Plaintiff was expected to work more than forty hours weekly. According to Plaintiff, when she discussed the job with Durham, she was told that she would be working around 55 hours per week, but she often worked more than that. Plaintiff claims her husband dropped her off on his way to work, and she began working each day between 6:00 and 6:30 a.m., and left work at around 6:00 p.m.

Defendants claim that Durham did not tell Plaintiff she would be working an average of 55 hours per week and, in fact, Durham did not expect one in Plaintiff's position to work overtime. As

3

for her average work day, Defendants assert that Plaintiff usually arrived after 8:00 a.m., frequently took lunch breaks away from the office that lasted more than an hour, and left at or before 5:00 p.m. Defendants also claim Plaintiff was also paid for several days when she was absent from work.

Plaintiff was terminated in August 2009. During the approximately four months that Plaintiff worked at V&T, she claims that she accrued 320 hours of uncompensated overtime.

## II. **LEGAL DISCUSSION**

Section 7 of the FLSA requires employers to pay employees time-and-a-half for work exceeding forty hours per week. 29 U.S.C. 207(a). Section 13 of the FLSA exempts from this requirement employees who are engaged in a *bona fide* executive, administrative, or professional capacity. 29 U.S.C. § 213(a)(1). "Although Congress did not define these terms, it designated the Department of Labor ("DOL") to take responsibility for implementing and clarifying the act." Ale v. Tennessee Valley Authority, 269 F.3d 680, 683 (6th Cir. 2011).

V&T argues that Plaintiff worked in an administrative capacity within the meaning of the FLSA exemption. Under the DOL regulations, an "employee employed in a *bona fide* administrative capacity" means any employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . , exclusive of board, lodging or other facilities;
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.

In this case, Plaintiff was paid more than $455 per week and so the pivotal questions (aside from whether she even worked more than 40 hours per week) are whether her work primarily related to the management or general business operations of the employer, and whether her primary work

4

duties included the exercise of discretion and independent judgment with respect to matters of significance.

Turning to the latter prong first, Plaintiff argues her job did not entail the exercise of discretion and independent judgment. Rather, she claims that she took down information, put the information into a computer which made the calculation, and then pushed the paperwork through the appropriate channels. If that is all Plaintiff did, then her contention that she did not work in a *bona fide* administrative capacity might have merit.

However, Defendants have offered facts which suggest that Plaintiff did exercise discretion and independent judgment. Those facts, which must be construed in Defendants' favor as the non-movant, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986), suggest that Plaintiff decided whether to replace damaged parts and, if so, whether to use new, used or refurbished parts from either the original equipment manufacturer or a third party. Plaintiff also allegedly decided whether to override computer estimates regarding labor hours, and she scheduled and prioritized the work of technicians, deciding which tasks to assign to which technician.

As for the former prong, Plaintiff argues her duties were not related to the management or general business operations of V&T, but rather her work was essentially production work. Thus, Plaintiff claims, for example, "[i]f a car came in with a broken headlight or bumper she only noted that information and put it in a computer program which generated the estimates," "she took marching orders from the computer," and "she just noted the damage and sheparded the process through the shop." (Docket No. 41 at 2).

Again, Defendants dispute Plaintiff's characterization of her role at V&T, and rely upon <u>Roe-Midgett v. CC Serv.'s</u>, 512 F.3d 865, 870 (7th Cir. 2008) for the proposition that Plaintiff's reliance upon the administrative/production dichotomy is misplaced. <u>Roe-Midgett</u> involved "material damage

5

appraisers" ("MDAs") who were employed by a company that was in the business of administering insurance claims on behalf of insurance companies and who claimed that their employer wrongfully classified them as employees subject to the administrative exemption under the FLSA. With regard to the administrative/production dichotomy, the Seventh Circuit wrote:

> . . . [T]he so-called production/administrative dichotomy – a concept that has an industrial age genesis – is only useful by analogy in the modern service-industry context. "The typical example of the . . . dichotomy is a factory setting where the 'production' employees work on the line running machines, while the administrative employees work in an office communicating with the customers and doing paperwork." Shaw v. Prentice Hall Publ'g, Inc., 151 F.3d 640, 644 (7th Cir.1998). The analogy is not terribly useful here, particularly given that the 2004 regulations suggest a more traditional meaning of "production." The new regulations state that the "directly related" test is met by employees who "assist[ ] with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a) (2006). MDAs are obviously neither working on a manufacturing line nor "producing" anything in the literal sense. They are service providers, and the service they provide is the administration of insurance claims.

Id. at 872-73.

Here, Defendants have set forth facts which suggest that Plaintiff assisted "with the running or servicing" of V&T's business. As they point out, V&T is in the business of repairing and restoring damaged vehicles – it does not sell damage repair estimates or consulting services. Inasmuch as Plaintiff was not a technician who repaired vehicles, she performed general business services necessary to facilitate V&T's restoration and repair business by making estimates, setting repair schedules, assigning and prioritizing repair work, providing quality assurance, and ensuring collection.

Moreover, to the extent that Defendants can show Plaintiff performed work similar to that of an insurance adjuster, this too would support their position that Plaintiff worked in a *bona fide* administrative capacity. Under the regulations, "[i]nsurance claims adjusters generally meet the duties requirements for the administrative exemption, whether they work for an insurance company or other

6

type of company, if their duties include activities such as interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation." 29 C.F.R. 541.203(a). While Plaintiff undoubtedly did not perform some of the foregoing activities in her role as an estimator at V&T, the regulations do not require that all the job duties listed need be met. See, Roe-Midgett, 512 F.3d 873 ("MDAs may lack some of the responsibilities traditionally associated with claims adjusting – they do not, for example, make liability and coverage determinations, see [29 C.F.R.] § 541.203(a) (2006) – but inspecting, appraising, and settling property damage claims are core adjuster functions").

Quite apart from whether Plaintiff worked in an administrative capacity within the meaning of the FLSA exemption, Plaintiff is not entitled to summary judgment on her FLSA claim because genuine issues of material fact exist as to whether she even worked more than forty hours per week. Plaintiff claims that she generally worked from 6:00 or 6:30 a.m. until 6:00 p.m., and that at least two emails from work bear time and dates which purport to show she was at work long before 8:00 a.m. On the other hand, Durham, Ben Durham (V&T's General Manager), Vicki Sprinkles (V&T's Assistant Manager) and Doreen Jawla (V&T's Parts Manager) have submitted declarations in which they recall Plaintiff reporting for work no earlier than at 8:00 a.m. and leaving at or before 5:00 p.m. Some of those individuals also recall that Plaintiff often took long lunches.

Clearly the issue of number of hours worked is not resolvable on summary judgment, and this remains so notwithstanding Plaintiff's contention that V&T failed to keep adequate time records, and her citation to Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946) in her reply brief. In Anderson, the Supreme Court held that where an employer fails to keep adequate time records, an

employee can satisfy her burden to show that she performed uncompensated work by producing evidence to demonstrate the amount and extent of such work "as a matter of just and reasonable inference," id. at 688, a burden which can be satisfied by recollection alone. "The burden then shifts to the employer to produce evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence" and, failing that, the court may award approximate damages to the employee. Id. Here, of course, the problem is not how to determine the amount of hours for which Plaintiff should receive overtime compensation; rather, the question is whether there exists an FLSA violation in the first place.

### III. CONCLUSION

On the basis of the foregoing, an appropriate Order will be entered denying Plaintiff's Motion for Partial Summary Judgment.

"

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE